Case No. 18-3170 and 18-3220, Portia Boulger v. James Woods. Oral argument not to exceed 15 minutes per side. Mr. Sandler for the appellants. Thank you. May it please the Court, with the Court's permission, I'd like to reserve three minutes for rebuttal. That is fine. Your Honor, in this case, defamation case, the district court ruled that an otherwise clearly defamatory tweet by the defendant, the well-known actor James Woods, was non-actionable, non-defamatory, because a question mark was put at the end of it. That ruling was mistaken. The law required the district court to look at the specific language of the tweet as it would be reasonably perceived, or perceived by a reasonable reader, reasonable follower in this case, of Mr. Woods' Twitter account. And had the district court performed that analysis correctly, it would have concluded that a reasonable follower of Mr. Woods' Twitter feed would not have perceived that tweet as a mere inquiry, an invitation to consider various possibilities, but as an assertion of fact. And in this, in that regard, the context matters. Whether we look at context as one of the two of the four factors that the Ohio Supreme Court has set forth for evaluation of whether a statement is an assertion of fact, or whether you look at the reasonable reader standard, the context matters here, the reasonable reader's perception. What happened here, again, just to frame the specific language and the context in this case, Friday night in March 2016, at the height of the presidential campaign, at a Trump campaign rally in Chicago, a woman's photographed giving a Nazi salute. Twitter users immediately start posting tweets identifying the woman as the plaintiff, Portia Bulger, a woman from southwestern Ohio, Chilacothe, who a long time- Can you just keep your voice up? Oh, sure. From Chilacothe, who was a very well-known activist and essentially a full-time volunteer for the Bernie Sanders for president campaign at that point. On Saturday morning, a user posts a tweet, a picture of the woman giving the Nazi salute, a picture of Ms. Bulger, a caption describing Ms. Bulger's work for the Bernie Sanders campaign and her activism in the Democratic Party. Are you arguing that she's a public figure? Does that come up? It has not. That issue was never reached, whether she was a limited-purpose public figure, and the defendant did not raise that. And that statement just said, the Trump Nazi is Portia Bulger. Within a minute, the defendant, Mr. Woods, posts on his Twitter account, with its 350,000 followers, the exact same picture of the woman giving the Nazi salute at the Trump rally, picture of Ms. Bulger, the same caption about her work for the Bernie Sanders campaign with the statement, so-called Trump Nazi is a Bernie Sanders agitator slash operative question mark. Now, the district court itself stated, were it not for the question mark at the end of the text, this would be an easy case. Woods phrased his tweet in an uncommon syntactical structure for a question in English by making what would otherwise be a declarative statement and placing a question mark at the end. Delete the question mark, and the reader is left with an unambiguous statement of fact. What's your really best argument that this, that one statement, I'll call it a statement, was a statement of fact versus a question? Because it was a reasonable reader could not, would not have, could not have perceived that to be an invitation to compare various possibilities. It didn't state, is this woman the same as the one giving the Nazi salute? Could this woman be the same? It was essentially a rhetorical question, and it's easy. Then why is the question mark there? The question mark, we don't know what the intent of the publisher, in this case Mr. Woods, was by putting the question mark there. But the reasonable interpretation, we think the only reasonable interpretation is it's basically a rhetorical question. But the original tweet wasn't a question, right? It was just a statement? Well, the original tweet was by someone else. Right, the original tweet that Woods partially retweeted, right? Yes. And he added a question mark to it? Exactly right. So why is that not an argument for why it's a question? I mean, if he just meant to make a statement, why wouldn't he just retweet the original tweet? Because it's essentially a rhetorical question that would be interpreted being, can you believe this? The woman who gave the Nazi salute is actually a Bernie Sanders operative trying to make the campaign look bad. But then, I mean, it could also be understood as an imitation to compare the two photos because they really don't look alike. Well, the question of whether they look alike, I think that Mr. Woods had concluded otherwise and his tweet clearly so implied. The issue is whether putting that question mark there changed the meaning. But what's the question? Is it, could any reasonable reader find it to be an assertion of fact? Or could any reasonable reader find it to be a question? Or how would you phrase it? Because those will give two very different results. It seems to us that the rule is, it's like the reasonable person standard. It's the average reasonable person and the average reasonable follower of Woods' Twitter feed, which has, and to look at the context here, like lots of Twitter feeds, it posts lots of news articles with his endorsement. In fact, as we all know in this day and age, a lot of people look at Twitter or Facebook for news instead of looking at the newspapers, the news pages or opinion pages that were the subject of the case law. And two other points. He characterized his own tweet and a subsequent tweet the next day as an observation, not as a question or a query. And then 10 days later, after this tweet had been up and a lot of the damage had been done and I called his attorney, he posted the statement, Portia Bulger is not the Nazi salute lady. And he deleted the earlier tweet at that point. And I would submit that one posts a correction, just like a newspaper puts a correction of a factual statement. You don't post a correction of an opinion or a query. Counsel, you've mentioned that we should look at context. The district court, I don't think, did a contextual examination. Or if it did, it was superficial. So how do we look at the context? If you look at the cases that talk about the totality of the circumstances analysis, they suggest that we look at both a general context and a broad context. Now we're talking about, you know, we're in the world of social media and Twitter as a medium. So if we're to look at context, what are the contours? What's the standard, let's say, of the general context? Do we look at Mr. Woods' tweets that day, that week? Do we look at them maybe the 11-day period from when he first posted until when he retracted? What test do you suggest that we use in terms of contextual examination? First, Chief Judge, if the general or broader context is that Twitter is a forum, unlike an editorial page or op-ed page on which people do expect to find and look for news and factual statements, much of which is posted by people they follow, celebrities, not necessarily media. But wouldn't you concede that Twitter also invites opinions and thoughts maybe more than many of us would like to read from time to time? I mean, you just see post after post where people are giving their thoughts about a tweet, retweeting things. And, yes, you have some factual content, but you also have, I venture to say, every bit as much, if not more, in terms of commentary. Yes, absolutely correct. But this was not – there wasn't a potential interpretation of this as opinion. The question is whether it was a factual assertion intended to be an observation or an endorsement of a factual assertion versus an invitation to just compare different possibilities or make an inquiry. To invite comment, you know, invite response, right? Well, certainly every tweet invites response, but it didn't – it doesn't seem that, again, because of the – as the district court observed the particular syntax, the nature of Woods' own Twitter account and the way that the tweet was put together, the specific content of it, that he was asking people to compare or inviting them to comment. He was saying, can you believe this? Look at this. I thought I saw somewhere in the briefing or in the record. If you look at Mr. Woods' Twitter account for a couple of week period around this situation, he had all kinds of tweets dealing with – that would just invite responses. He was critical of the then president. He was critical of at some point of I think former President Clinton as well and invited comment. He also posted personal stuff about his pet and things like that. I mean, all kinds of stuff. So there's a little bit of news. There's a lot of stuff just general here's what I'm thinking. What's your response? All tweets invite comment and maybe opinion, but a lot of tweets are retweets of news articles or just factual assertions of rumors in this case that are factual in nature and are not matters of opinion. Sure, everything invites comment, but they're not matters of opinion and are not intended to invite inquiry as opposed to making a factual assertion. And what about the innocent construction rule? You agree that's the rule in Ohio, right? It is. It is indeed the rule in Ohio, but when there's only one reasonable interpretation, that innocent construction rule doesn't have a role. And the issue, the question is, well, the mere use of a question mark means there's another alternative explanation. We think the case law is that, no, if you say, when did the plaintiff stop beating his spouse? Where is the money that the plaintiff embezzled from us? It's that kind of statement. It's too easy to turn a statement of fact into a rhetorical question of that nature.  It actually is a question of law that it is properly addressed on a dispositive motion. Thank you, Your Honor. Thank you, Mr. Sandler. May it please the court, counsel, I'm Patrick Kass, and I represent Mr. Woods. Judge White, you turn the court's attention to the issue here. Ohio has a state constitution which contains a freedom of speech clause. The Ohio Supreme Court has consistently held that that freedom of speech clause provides greater protection in defamation cases than the federal. So Ohio has different tests in a defamation case, and as this court has held for decades, in a diversity case, Ohio law controls. So the first principle, as Judge White pointed out, is the innocent construction rule. And that rule is very simple. If it can be interpreted two different ways, the court is to interpret it in the non-defamatory way. But when you say if it can be interpreted in two different ways, I mean, if one in a hundred people might interpret it that way, but the clear meaning is different? I mean, what's the standard? There are certainly questions that are so clearly not a question that you wouldn't interpret it in a non-defamatory way. But if there's two reasonable interpretations, as Judge Smith found here, then under Ohio law, there must be an interpretation that it's non-defamatory. So look at the tweet here. Judge Cole, you referenced Mr. Woods' tweets over the course of the weeks. None of those ended with question marks. He'd post an article. He'd give his comments about it for the period. Here, this tweet, he specifically tweets when everybody else is tweeting the same thing. He tweets, you know, is the Trump Nazi saluter a Bernie Sanders agitator? He puts both photos up to compare. Does he say is? He starts it with is? No. He says, but the question mark implies that. Since first grade, we're taught that a question mark means it's not. Right, but let's be accurate on what it says. I apologize. It says Bernie Sanders, I'm sorry, it says so-called Trump Nazi is a Bernie Sanders agitator slash operator question mark. It has is there, which. Is that, yes. But then what wasn't mentioned was within hours, within hours of him posting these two photos and so forth, he then tweets again. On the same day, that night, my followers have indicated that Patricia Bolger is not, and he puts not in capital letters, the Nazi salute lady, and I'm paraphrasing that. So before he gets contacted by a lawyer, before he hears from anybody, he puts this question mark out. It elicits a response to the question, and he tweets within 10 or 12 hours. He tweets in the morning, the question. Later that night, he tweets, it's not her. All right, no one, it clearly could reasonably be inferred, seen as a question. And whether you think he meant it or not, or whether you can argue it one way or the other, the simple fact is you could reasonably look at that sentence with a question mark at the end of it and feel it's a question. Under Ohio law, that's the end of the inquiry. It's the end of the inquiry. But Ohio also has a four-part test. First, looking at the statement, which is what we just did. The second part of it is, is it verifiable? So in determining whether it's a declarative statement or something else, the second part of the Ohio analysis is, does the tweet suggest that Mr. Woods has firsthand knowledge of this? And the answer is no, it's a retweet. If I tweet a Newsweek article and say, hey, look at this, can you believe this or whatnot, am I liable if Newsweek is wrong? Well, but that's not what he did. He posted two pictures. He didn't refer anybody to an article. He retweeted somebody else's tweet, though. Well, if he had just plain retweeted it, he'd have a real problem. He didn't just retweet it. He changed it. He retweeted and asked a question, and the question the Ohio Supreme Court says to ask is, in doing the retweet and stating what he stated, is he implying he has firsthand knowledge of this? And the answer is clearly no. First of all, using the innocent construction rule, he's asking a question. He's an actor. The complaint says he's an actor. He's not a news journalist. There's nothing about it that says he was at the convention. There's nothing about it that says he's done anything other than see this. But it is verifiable, right? But the question, according to the Ohio Supreme Court, is whether Mr. Woods has done anything to suggest that he has firsthand knowledge of it. And if he hasn't done that, then the verifiable prong of the Supreme Court's test isn't met. Then the next part of the text is the individual context. And, Judge Corliss, what you referred to, looking at what he does. In the individual context, what happened here around this tweet? First, we know that it was answered, right? We know that it was answered, and we know before there were any lawyers involved, before anything happened, he, that night, indicated my question's been answered. She's not it. So that lends itself against this. When did Mr. Sandler respond? Right, so that got lost in argument earlier. So before Mr. Sandler got involved at all, that night that Mr. Woods tweeted it, he tweeted again and said, it's not her. My followers have responded, it's not her. That night. There were no lawyers involved. Nobody complained to him. He did it on his own. Then, because the whole string of tweets were still up, Ms. Bolger's lawyers got involved. And once she got involved, then he tweeted three different ones later and said, look, as I reported earlier, it's not her. I'm told she's being harassed. Don't harass her. All right, so that happened afterwards, but it's got to be clear. The night it occurred, he said it wasn't her on his own because his followers responded to the question. And so looking at it in terms of the context to determine whether it's a question, it got answered. And he posted the answer. Clearly a question. Was this attached to the complaint? Yes, the complaint referenced it. Okay. Complaint referenced it. So, yeah, no, absolutely. That night. I mean, that's what got lost in there. It's not like his arms were twisted to say this. That night he said it's not her on his own. So, I mean, it mitigates against any attempt to defame anybody, any attempt to do anything other than broadly comment on this and ask a question. We look at context. We also look at sort of the broader context. That seems to be one of the tests. Do we look at just Twitter as a medium? What do you propose we look at? My next point is the broader context, Your Honor, and that is the fourth element according to the Ohio Supreme Court. Twitter, by its definition, and we've cited some cases, is a personal medium. People are on there putting all kinds of things on there. It's social media, which is new areas for the courts. But it's not a news media. Certainly, CBS has a Twitter account, all right? This was a personal Twitter account. We certainly can't have a rule that says that if you post it on Twitter, you're not liable because everybody knows it's just your personal opinion. I mean, if you start putting things up there like so-and-so is a drug addict and so-and-so is a crook and, you know, so-and-so just robbed a bank, are you implying that none of that can be libelous? That is the difference between Ohio's position on freedom of speech and defamation and the New York Times' V. Sullivan Second Amendment position. Yes, in Ohio, Wampler and Vail are clear that under Ohio law for defamation, opinion testimony is protected. It may not be fully protected under federal law. But you're saying that for what Judge White is saying, in Ohio I can say somebody is a crook on Twitter and I wouldn't be liable? No, but if it's truly opinion, if it's truly opinion testimony. Well, I'm not giving you opinion. Yes, there's a certain, you know, if you say this is a subjective universe and every statement of fact is really opinion, I suppose you could make it opinion. But I'm talking about statements of fact like so-and-so stole $10,000 from me. Sure. And what Ohio says to that is there's a four-part test and that the context in what it said is one of those four elements. So the broader context would be what type of medium is Twitter itself? And Twitter generally is personal thoughts and it's one of the factors to consider. So obviously if the other three factors mitigated against it and showed it was defamatory, then the fourth factor wouldn't control. What I'm suggesting to the court is under the first factor, which is what the statement says, using the innocent construction rule, it clearly is a question. The second factor using verifiability, Mr. Woods is not a newscaster. There's nothing about that tweet that suggests he has firsthand knowledge, which is the second Ohio Supreme Court factor. The third factor is a smaller context, the general context, where Mr. Woods clearly answered the question. The question was answered later in the day. Under that context, it appears not to be a statement of fact. And the last is the broader context under Twitter. And what I'm suggesting to the court is if you look at the broader context of Twitter, that factor mitigates as well because it was a personal site. I think Judge Smith got it right. I don't think you need to go past the innocent construction rule. And whether Ohio's law is right or not, Ohio law is controlling here. And the innocent construction rule, unless you can say as a matter of law, that question was actually just a statement. Unless you can say that as a matter of law, then I think it ends it here. And because it had a question mark, because it was answered, because of the actions that occurred that day before any lawyers got involved, Judge Smith got it right. You clearly could interpret it as a question. If it's a question, it's not a declaration of fact. So you also have a cross appeal. I do. On the service issue. So in what order do we address these issues? Well, I think Judge Smith got it right. The service issue should be addressed first. And I understand the service issue. Nobody likes someone who's unwilling to accept service. So if we were to address the service issue and say that he didn't waive it, then this judgment in your favor is a nullity, right? It's a nullity, but it's also time barred from another action under Ohio law. So either way, the case is over. But, yeah, I understand the service issue. Nobody likes someone who doesn't want to accept service. I get that. I get that. You know, from Mr. Wood's perspective, they didn't sue anybody else. Why would you file an answer before you've been served? As a practical matter, not all judges in your circuit are as quick as Judge Smith can be. All right? So I think there's a benefit to getting a motion for judgment on the pleadings on, because I assume they would serve him. I just assume they would serve him. If you look at what we did here, the test under your challenge for whether I waived is whether we did anything to suggest to plaintiffs that we were going to waive service. So they filed on June 1 a motion that said they had spoken to me, and I said I'm going to file an answer, I'm going to assert service, you still need to serve him, and I'm going to file a motion for judgment on the pleadings, which I did. The court then gave them additional time to serve Mr. Woods because they said, in answers coming with service as a defense, we need to serve him. Then we had the Rule 26-F conference, and I said again, you haven't served him, and we put it in Rule 26 report. Mr. Woods is contesting service. I don't think you answered my question or else I didn't understand it. Why would you file an answer if you weren't served? We do it routinely. Sorry, what? We do it routinely to get things moving. So if I just waited until they didn't serve him. But you're telling the other side you're defending the case, right? I'm not because, as the court noted in the King case, you can preserve service by putting in the answer. Then you file a motion, I mean, you do a 26-F. I mean, you're litigating the case at that point. I'm litigating the case expressly telling them they still need to serve him. It serves no purpose to file a service motion and maybe I lose that service motion or they get him served a year down the road, and then you file your motion for judgment of pleadings. I just assumed they would serve him. I mean, we told them they needed to serve him. We put it in the Rule 26 report. They put it in a motion to the court and got additional time to serve him. And I just assumed they would serve him, and I wanted to get the case on. It makes no sense, in my view, to wait to see if they serve him and then file something on that, and the court takes a while to decide it. And then if I lose that, then I've got to file the motion for judgment of pleadings, which we all agree in this case should be decided before any discovery takes place. And so that's the way it's routinely done. But isn't that a . . . well, I don't think so, but I would defer to . . . But isn't that another way of saying, look, we just . . . you haven't served us, and you probably will, but we're going to opt to let the court . . . we want the court to handle the case on the merits. In this court, I had a case where in a Rule 26 conference, the parties didn't mention it. And I agree with you. If I hadn't been clear multiple times in conversations, in pleadings, in the Rule 26 report that they still needed to serve him, I would agree with you. But the test this court has is whether or not we've done anything to lead them to believe they don't need to serve him. And if you look at the motions, if you look at the Rule 26 report, the conversations up on counsel, that never occurred. They represented to the court in a motion, knowing a motion for judgment on pleadings was coming, but they needed additional time to serve him. Thank you. One last question that goes back to the issue of whether it's a question or a statement, just to clear the record. It seems that you agree, that we all agree, that just placing a question mark at the end of words, at the end of a statement, does not make that a question. I mean, you have to look beyond just the fact that there's a question mark. You do, but the question mark is significant. As Judge Smith noted, he couldn't find any cases where a question with a question mark had been found to be defamatory. But you can certainly have statements, factual statements, and factual statements that are false, and someone just happens to place a question mark at the end. You don't suggest that there's immunity from a defamation lawsuit just because you place a question mark at the end of words. I don't, but the question mark matters. What about the Schoedler case from Ohio? Didn't that have some question marks in it? That's the 1944 case that was decided before Vail. It was decided before WAMP, or before we had this test. It was decided before the innocent construction rule. Why didn't you mention it in your brief? The Schoedler case? Yeah. Because I didn't think it was relevant in the sense that it didn't employ the modern Ohio test. But, I mean, it had statements with question marks, and, I mean, it seemed to be pretty, I mean, maybe not on all fours, but close, wasn't it? I don't think so in the sense that . . . But wouldn't you even just distinguish it and say, hey, they cite this case? They didn't cite it below, and so I guess we didn't see it coming. I didn't look at any law before the modern Ohio test. The Ohio Supreme Court in Vail came up with a modern test, tied it to the Ohio Constitution, and Yeager and McKim came up with the innocent construction rule. That case was four or five decades prior to the modern Ohio standards. It didn't use the modern Ohio standards. It didn't in any way, in my view, address the actual test under Ohio law now. But it seems that you agree that the fact that a question mark is used may be a factor, but it's not necessarily the determining factor. Just because there's a question mark does not make that statement a question. I guess I'm just trying to get at a basic, sort of basic answer from you on that very simple point. I agree there are situations where the question mark itself could be thrown in there for the heck of it to hide really a declarative statement, of course. I just don't think this is that case, and I certainly think the question mark, when you determine that Ohio's innocent construction rule, whether it could be deemed a question is very significant because every grammar book I could cite to you says if you want to make a question, you end the statement with a question mark. Okay, thank you. Thank you. Mr. Sandler? Thank you, Your Honor. With respect to the cross-appeal issue, waiver of insufficient service defense, with respect to opposing counsel, there is a benefit to what he did. The benefit is that you get a decision on the merits and then you keep the insufficient service defense in your back pocket as a backup in case you lose it, and that's exactly what Rule 12g2 is intended to prevent. In the words of this court in the Routes v. Day and Night case, to prevent the piecemeal presentation of Rule 12 defenses so that the court, in this case, the judge could have ruled on that, motion for judgment on the pleadings. He might have, let's say, ruled in our favor, and then comes the defendant, well, I still have this defense. I preserved it in the answer. That's not permitted under Rule 12h. It defeats the whole purpose. The issue of reasonable expectation that the defendant would come and defend the case on the merits. He did come, presented a motion for judgment on the pleadings, and other courts have recognized that that, since you can't get a decision on that unless the court has in personam jurisdiction necessarily conceding that. So at what point? The answer raised the no service issue. The motion was filed the same day as the answer, right? Judgment on the pleadings, yes. Okay. And then there was the 26F that came after that, right? That's right. And it was raised there. But at what point did you assume that they were litigating the merits without regard to the service? They were litigating the merits when they filed the motion for judgment on the pleadings. There was nothing that compelled him to file the motion for judgment on the pleadings at that point. He could have complied with the rule by filing it together with a motion to dismiss based on insufficient service. His time hadn't started to run because he hadn't been served. His time to move and answer hadn't run. So with respect to the record of what was said, the issue of whether there was an effective retraction, of course, is not before the court, not part of this record. But for the record, the tweet that Mr. Woods put out that night did not say that he retracted his statement. He said various followers have stated that the Nazi salute individual and the Bernie campaign woman are not the same person. I'm not endorsing Trump nor anyone else in this thread about the organized Chicago thug antics. I'm simply making some observations. It doesn't sound that he's retracting anything. He's reinforcing that his observations, factual observation earlier that day, stands until he retracted. He did retract it 10 days later. Mr. Sandlin, what's your view of this verifiability test? Do we look at whether it can be verified that the person given the salute was or was not Ms. Bolger, or do we look at whether we can verify that Mr. Woods knew? Sure. The objective verifiability test is a way of distinguishing fact from opinion. If you say Senator Smith's doing a terrible job, you can't shoot for defamation of that because it's a matter of opinion. It can't be objectively verified. This could clearly be objectively verified. Either the Nazi salute woman was Ms. Bolger or she wasn't. It was a statement of fact, and once it's interpreted properly as a statement of fact, it's clearly one that's objectively verifiable. Okay. Thank you very much, counsel, for your arguments this afternoon. We very much appreciate them. The case will be submitted.